IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MAGNA CARTA HOLDINGS, LLC, Plaintiff, | ) | |
| v. | ) | Case No. 08 C 7406 |
| NEXTGEN HEALTHCARE INFORMATION SYSTEMS, INC., FOX MEADOWS SOFTWARE, LTD., and E-CLINICAL WORKS, LLC, Defendants. | ) | Judge Virginia M. Kendall |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Magna Carta Holdings, LLC, ("Magna Carta") sued E-Clinical Works, LLC ("E-Clinical") and others alleging E-Clinical's Words electronic medical records system infringes on United States patent nos. 5,704,371 and 6,026,363 (together, the "patents in suit"). The Court stayed the proceedings for 18 months while the Patent Office re-examined the patents in suit. During re-examination, the Patent Office allowed only those claims that included what the parties call "the Comparator Term." The Court then granted E-Clinical's request that the Court construe the Comparator Term before any of the other disputed claim language, as the parties noted (albeit at different times) that the Court's construction of the Comparator Term would likely end the case, either via summary judgment motion or settlement. (*See* Docs. 84, 101.) For the below reasons, the Court construes the Comparator Term as follows:

> A software tool or data structure that examines one thing to see if it is analogous to a second thing, the two things being: (1) predetermined code words, numbers or symbols recorded on a physical or electronic form; and (2) a longer written description of medical information assigned to the particular code word, number or

> symbol. The comparator does not, by itself, decode the predetermined code words, numbers or symbols into the longer written descriptions of medical information.

## I. BACKGROUND

The patents' specifications[1] disclose systems for recording information about a patient during a medical examination. As the doctor examines the patient, he or she tells a medical assistant certain information about the patient. The medical assistant then records that information using a series of codes. Those codes are later, manually or via computer, transcribed (or decoded) into their corresponding formal explanations for purposes of preparing a patient report. For instance, using the example in the specification, a doctor examining a patient would say "male-02" to the assistant. The assistant would type that code into a computer. The computer would then transcribe that code into its assigned explanation, "CURRENT COMPLAINTS: The patient denies any right hip pain. This has improved since his last visit." After decoding, the computer would then generate a patient report that reads in natural language to put in the patient's file or for any other purpose. In essence, the invention is a shorthand system that frees highly-compensated and notoriously busy doctors from having to spend time writing notes in their patients' charts.

## II. STANDARD OF REVIEW

Claim construction resolves disputed meanings in a patent to clarify and explain what the claims cover. *See Terlep v. Brinkmann Corp.*, 418 F.3d 1379, 1382 (Fed. Cir. 2005). The construction of the claims at issue is a legal determination to be made by the court. *See id.* (*citing Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995)). Generally, the terms of a claim are given the ordinary and customary meaning that the terms would have to a person of

[1] The '363 patent is a continuation of the '371 patent so their specifications are substantially the same.

ordinary skill in the art at the time of the filing date of the patent application. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005). When interpreting an asserted claim, the court looks first to intrinsic evidence: the words of the claims, the patent specification, and the prosecution history. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

The claim language is the starting point for claim construction analysis because it frames and ultimately resolves all issues of claim interpretation. *See Robotic Vision Sys., Inc. v. View Eng'g Inc.*, 189 F.3d 1370, 1375 (Fed. Cir. 1997). In some cases, the "ordinary and customary" meaning of the claim language may be readily apparent, even to lay judges, and the court applies the widely accepted meaning of the commonly understood words. *See Phillips*, 415 F.3d at 1314. In such cases, a general purpose dictionary may be helpful. *See id.* In many cases, however, the court must proceed beyond the bare language of the claims and examine the patent specification. *See id.* at 1314-15. "The person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* at 1313. The specification is usually dispositive; "it is the single best guide to the meaning of a disputed term." *Id.* at 1315 (*quoting Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). In the specification, the patentee provides a written description of the invention that allows a person of ordinary skill in the art to make and use the invention. *See id*. at 1323. At times, the patentee uses the specification to "set forth an explicit definition for a claim term that could differ in scope from that which would be afforded by its ordinary meaning." *Rexnord Corp. v. Laitram Corp*., 274 F.3d 1336, 1342 (Fed. Cir. 2001).

The court may also look to the patent's prosecution history. *See Phillips*, 415 F.3d at 1317. While the prosecution history often lacks the clarity of and is less useful than the specification, it

may inform the court of the meaning of a claim term by illustrating how the inventor understood the invention as well as how the inventor may have limited the scope of the invention. *See id.* The prosecution history is generally relevant if a particular interpretation of the claim was considered and specifically disclaimed during the prosecution of the patent. *See Schumer v. Lab. Comp. Sys*., 308 F.3d 1304, 1313 (Fed. Cir. 2002).

Finally, a court may also consult "extrinsic evidence," such as dictionaries, treatises, and expert testimony, to "shed useful light on the relevant art." *Phillips*, 415 F.3d at 1317-18. Generally, extrinsic evidence is "less reliable" than intrinsic evidence and is "unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1318-19. With respect to the use of dictionaries, technical or general, a court may consult such evidence "so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents." *Id.* at 1322-23.

## III. DISCUSSION

### A. The Comparator Term and the Parties' Proposed Construction

The Comparator Term appears in all the claims that Magna Carta asserts against E-Clinical. It reads: "a comparator for comparing the optional text variable segment to the encoded indicia." (*See* Doc. 95-1, '371 patent, ind. claims, 2, 7, and 17; Doc. 95-2, '363 patent, ind. claims 2, 7, 17 and 39.) When the Patent Office re-examined the patents in suit, it disallowed many claims as anticipated by the prior art or unpatentable as obvious. (*See* Doc. 95-7, '371 re-examination action.) However, the Patent Office allowed the claims that included the Comparator Term. (*Id.*) For instance, post re-examination, claim 2 of the '371 now reads, in part, as follows (with the Comparator Term in italics):

> A medical documentation system comprising
>
> . . .
>
> a processor having at least one report section template corresponding to one of a patient's current medical condition, a patient's physical examination, a patients diagnosis and a patient's treatment plan, said at least one report section template comprising optional text variable segments each of which are assigned to a selected one of said predetermined encoded indicia said processor being operative to decode each of said one of the predetermined encoded indicia into its assigned optional text variable segment in said at least one discrete recording section and storing the same in a retrievable format, said processor including a computer for the decoding each one of said predetermined encoded indicia into its corresponding optional text variable segment, wherein said processor includes *a comparator for comparing the optional text variable segment to the encoded indicia recorded on the recording member.*

(*See* Doc. 95-1, '371 re-examination certificate.)

The parties put forward the following proposed constructions of the Comparator Term:

| **E-Clinical** | **Magna Carta** |
|---|---|
| A software tool that compares two inputs, the two inputs being: (a) code words, numbers or symbols recorded on a physical or electronic form (encoded indicia), and (b) a description of a patient's medical information corresponding to the encoded indicia. This software tool does not perform any decoding of the code words, numbers or symbols. | A data structure for describing two things as being analogous, the two things being (a) a predetermined short indication of medical information on a physical or electronic form, and (b) a corresponding longer description of the medical information. |

(Doc. 106.)[2]

[2] E-Clinical tweaked its proposed construction in response to points raised in Magna Carta's brief. (*See* Doc. 106.)

## B. The Court's Construction

### 1. "Optional Text Variable Segment" and "Encoded Indicia"

As an initial matter, the parties offer very similar constructions of the terms "optional text variable segment" and "encoded indicia." In both proposed constructions, the encoded indicia are the shorthand notations that the medical assistant puts into the form. In the example above, the encoded indicia is "male-02." The optional text variable segment is the longer, more formal description assigned to the particular encoded indicia; continuing with the example, the segment would be the "CURRENT COMPLAINTS" language above quoted from the specification.[3] Taking the best from both proposed constructions in light of the Court's reading of the specification, the Court determines "encoded indicia" means "predetermined code words, numbers or symbols recorded on a physical or electronic form" and "optional text variable segment" means "a longer written description of medical information assigned to the particular code word, number or symbol."

### 2. "Comparator" and "Comparing"

Thought the parties more or less agree *what* is being compared in the Comparator Term, they disagree about: (1) what exactly the comparator is; in other words, specifically what is doing the comparing; (2) what "comparing" means. The Court turns first to the specification. *Robotic Vision*, 189 F.3d at 1375. As the parties note, there are just two explicit references to the Comparator Term in the two patents' common specification. The first states:

> Another advantage of this invention is that the computer used in the system may include a comparator for comparing the optional text variable segment to the encoded indicia recorded on the computer

---

[3] During prosecution, Magna Carta called the encoded indicia "code words that are uttered, spoken or communicated by the physician or healthcare person during a patient examination." (*See* Doc. 95-9 at MCH 001396.)

> input device. In addition, the computer can be programmed to verify the results of the comparison for accuracy and validity.

(Doc. 95-2, '363 patent, col. 8, ll 11-16.) The second reads:

> The text look-up tables 236 can be used as a comparator for comparing the optional text variable segments to the encoded indicia recorded on the recording member 170.

(Doc. 95-2, '363 patent, col 16, l. 66 - col. 17, ll 1-2.) Beginning with what "comparator" means, the parties draw a clear distinction in their papers between software and data structures. The second reference, which states that a look-up table can serve as the comparator, makes clear that E-Clinical's use of "software tool" in its proposed construction is too restrictive. E-Clinical asserts that the comparator is software that "actively compares" while look-up table is a "static data structure[] that merely house[s] data." (Doc. 105 at 5-6; *see also* Doc. 94 at 6-7.)[4] That view simply cannot be squared with the specification, which explicitly states that a look-up table can be the comparator. E-Clinical implicitly concedes as much in its opening brief, when it argues that the Court should set aside the second reference because the specification does not explain how a look-up table, which has only one input (and then one output) could serve to compare two inputs. (*See* Doc. 94 at 7-8.)[5] In short, the Court cannot discard one of two explicit references to the comparator in the specification, and E-Clinical's construction only takes into account the first reference.

On the other hand, Magna Carta's construction, which is limited to only data structures, is also too limited. The second reference is clear that a look-up can be used as the comparator, but that

---

[4]A look-up table, according to PC Magazine Encyclopedia, is "an array or matrix of data that contains items that are searched. Lookup tables may be arranged as key-value pairs, where the keys are the data items being searched (looked up) and the values are either the actual data or pointers to where the data are located." (*See* Doc. 94-6.)

[5]For the same reason, the second reference makes E-Clinical's "two input" construction unworkable.

reference, read together with the first reference, does not suggest that *only* look up tables can serve as the comparator. In other words, the second reference does not rule out that a piece of software is doing the comparing. Indeed, the first reference states that the comparator is part of the computer; a "computer" in this context would certainly include software. Magna Carta does not disagree. (*See* Doc. 104 at 6 ("computers include many things other than software.").) Consequently, the Court finds that the comparator could be either a "software tool" or a "data structure."

That leaves the meaning of the word "comparing." Magna Carta wants the Court to construct the term, asserting that "comparing" should be given its plain and ordinary meaning, that is: describing "two things as being analogous." Magna Carta bases its construction on the dictionary definition of "compare," which, in Magna Carta's dictionary, is defined first as "[t]o consider or describe as similar, equal, or analogous; liken" and second as "[t]o examine in order to note the similarities or differences of." (*See* Doc. 104-2.) According to E-Clinical, Magna Carta is picking one part of the dictionary definition and ignoring the other parts, especially the second definition. Though E-Clinical asserts that "comparing" needs no construction because a jury could give "comparing" its plain and ordinary meaning, it offers a plain and ordinary meaning of comparator, namely: "a thing that examines one thing (encoded indicia, however defined) in light of another thing (optional text variable segment, however defined)." (Doc. 105 at 2.) Consequently, here the plain and ordinary meaning of "comparing" is in dispute. Though the Court may use a dictionary to determine the plain and ordinary meaning of a claim term, it must consider that definition in the context of the intrinsic evidence. *Philips*, 415 F.3d at 1318-19, 1322-23 ("[d]ifferent dictionaries may contain somewhat different sets of definitions for the same words. A patent claim should not

rise or fall based upon the preferences of a particular dictionary editor, or the court's independent decision, uniformed by the specification, to rely on one dictionary over another.")

Returning to the specification, the first reference makes clear that the comparator's comparison seeks to match up the correct encoded indicia to its proper optional text variable segment. Magna Carta's use of the term analogous better recognizes that there is a pre-assigned connection between the encoded indicia and the optional text variable segment. Indeed, the goal of the invention is to properly translate the doctor's codes into a patient report in natural language. In that context, "comparing" is best constructed as "examining one thing to see if it is analogous to a second thing." Consequently, as used in the patents-in-suit, a comparator is a "software tool or data structure that examines one thing to see if it is analogous to a second thing."

**3. Decoding**

Finally, E-Clinical seeks a clarification that the comparator is not decoding the encoded indicia. Magna Carta concedes that the comparator does not decode by itself, but asserts that the computer's hardware and software use the look-up tables to perform the decoding function, making E-Clinical's clarification incorrect. The parties center their arguments on figure 6 from the common specification, reproduced below:




(*See* Doc. 95-1 at JTAPP00006.) With respect to this figure, the specification states:

> FIG. 6 is a pictorial diagram illustrating the information flow from the recording device 170 into a processor or computer/operating system shown generally as 216 . . . . The processor or computer/operating system 216 includes one or more of the following: various data files 220, a data base program 224, encoded indicia translation programs 228, text look-up tables 232, text processing programs 236 . . . . As such, the computer/operating system includes programing for the decoding of the optional text variable segments corresponding to each one of the predetermined encoded indicia. The text look-up tables 236[6] can be used as a comparator for comparing the optional text variable segments to the encoded indicia recorded on the recording member 170 . . . .

(Doc. 95-1, '371 patent spec., col. 16, ll. 45-63.) E-Clinical asserts that this section of the specification demonstrates that the comparator is distinct from the decoding component. The figure and text make clear, however, that the various components identified at 220 through 240 are components of the computer. The specification states that the computer—everything at 216 and

[6]As E-Clinical points out and Magna Carta does not dispute, this reference to the look-up tables in the specification mistakenly identifies the look-up tables at 236. It should read 232.

under in the figure—is doing the decoding. That necessarily includes the look-up table at 232, which is the comparator in this figure. In the same vein, E-Clinical asserts that Magna Carta is estopped from arguing the comparator is involved in the decoding process because it told the Patent Office "[i]n Applicant's invention, . . . a transcriber or processor of processing reads the indicia and generates an optional text variable segment by decoding the indicia." (Doc. 94 at 11.) That statement is consistent with the specification, where the "processor or computer/operating system," overall, is decoding.

Finally, E-Clinical asserts that various the claim language supports its sharp distinction between the decoding process and the comparator. For instance, E-Clinical points to the reissued claim 2 of the '371 patent, quoted above in Section III.A, asserting that it shows that the decoding process and the comparator are two different things. That claim language, however, suggests the opposite. It makes clear that the processor includes a computer for the decoding, and that processor "includes a comparator." That language is consistent with the comparator playing a role in the decoding process. In sum, the specification contemplates the comparator being involved in the decoding process and E-Clinical's requested clarification must itself be clarified that the comparator, *by itself*, does not decode.

## IV. CONCLUSION

For the foregoing reasons, the Court constructs the Comparator Term as follows:

> A software tool or data structure that examines one thing to see if it is analogous to a second thing, the two things being: (1) predetermined code words, numbers or symbols recorded on a physical or electronic form; and (2) a longer written description of medical information assigned to the particular code word, number or symbol. The comparator does not, by itself, decode the predetermined code words, numbers or symbols into the longer written descriptions of medical information.

In advance of the next status hearing, the parties shall meet and confer regarding what additional proceedings are necessary in light of the Court's construction and the parties' representations that the Court's construction of the Comparator Term would streamline the case. Three days before the status hearing, the parties shall file a status report reflecting their meet-and-confer and proposing a schedule for future proceedings.

Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: March 9, 2012